UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC RODERICK JOHNSON,

    Plaintiff,

v.

OFFICER ADAM DICKIE (Official and
Individual Capacity), OFFICER MICHAEL
QUARANTA (Official and Individual Capacity),

    Defendants.

_____/

Case No. 24-10401

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF No. 16)**

Plaintiff Eric Roderick Johnson filed this action against Defendant City of Warren Police Officers Adam Dickie and Michael Quaranta, in their official and individual capacities. Plaintiff alleges a § 1983 excessive force claim against Defendants for actions they took pursuant to a traffic stop and subsequent arrest executed on September 28, 2022. The matter is before the Court on Defendants' motion for summary judgment. (ECF No. 16.) Plaintiff filed a response in opposition to Defendants' motion. (ECF No. 19.) Defendants filed a reply. (ECF No. 20.) Upon a careful review of the written submissions, the Court deems it appropriate to render its decision without a hearing pursuant to Local Rule 7.1(f)(2). For the following reasons, the Court finds that Defendants' actions did not violate Plaintiff's Fourth Amendment rights, and that Defendants are entitled to qualified immunity as it relates to Plaintiff's excessive force claim.

I.    Facts

On September 28, 2022, at 6:11 p.m., Plaintiff was driving his Chevrolet Camaro in the City of Warren. Officers Dickie and Quaranta were on patrol in their squad car when they observed Plaintiff make an improper left turn from the inside lane to the outside lane in violation of MCL 257.647 (ECF No. 16-4, PageID.178.) The Officers caught up to Plaintiff's vehicle and noticed the window tint prevented them from seeing inside the vehicle in violation of MCL 257.709. Quaranta rans the vehicle's license plate, and the officers proceeded to initiate a traffic stop. Plaintiff slowed down, driving two or three blocks before coming to a stop in the bike lane.

Officer Dickie approached the driver's side and Officer Quaranta approached the passenger side of the Camaro. Officer Dickie knocked on the driver's window to get Plaintiff's attention, but Plaintiff did not roll down his window. Quaranta knocked on the passenger front window and signaled for Plaintiff to roll down the window, but Plaintiff did not comply. Because Officer Dickie could not see what Plaintiff was doing inside the car due to the tinted windows, he opened the driver's side door. (ECF No. 16-4, PageID.193, 200; Ex. 4 Officer Dickie's Body Cam video at 1:20.) Plaintiff held onto the door handle and tried to close the car door. Dickie instructed Plaintiff to stop trying to close his door and asked him to turn off his car, repeating the order four times before Plaintiff complied. Dickie then asked for Plaintiff's driver's license. (*Id*. at PageID.194; Body Cam video at 1:20-32.)

Plaintiff typed on his cell phone and repeatedly asked the officers to get him a "white shirt" in response to Dickie asking for his license. (Body Cam video at 1:36-48.)

2

Dickie and Plaintiff went back and forth seven times in this manner – "give me your license" – "white shirt" - culminating in Dickie telling Plaintiff he was under arrest. (*Id*. at 1:50.) Plaintiff responded that he was not getting out of the car and continued to repeat that he wanted a "white shirt" each time Officer Dickie told him to get out of the car. (*Id*. at 1:53-2:00.) Plaintiff did not comply with the officers' orders, verbalized his disagreement with each of their instructions, and remained seated and in his car seat.

Officer Dickie obtained Plaintiff's keys and threw them off to the side of the road. (*Id*. at 2:04.) One Defendant held onto Plaintiff's arm as Defendants instructed him to get out of the car. Plaintiff responded: "I said white shirt, I got that right" and "that's assault." (*Id*. at 2:04-10.) Plaintiff then asked his wife, who was on FaceTime, if she saw what was happening (*Id*. at 2:16-18.) Defendants continued to tell Plaintiff to stop resisting and get out of the car with his hands in the air as they attempted to remove his seatbelt. (*Id*. at 2:18-28.) Officer Dickie's body camera mostly captured Plaintiff's lower body, periodically showing his upper body when the officer stepped back from the car.

At this point, Officer Dickie sprayed Plaintiff with a burst of pepper spray and told Plaintiff to get out of the car or he would spray him again. (*Id*. at 2:28.) Officer Dickie testified that he did not think the spray made contact with Plaintiff's eyes, so he sprayed him a second time but Plaintiff raised his arms to block the spray. (No. 16-4, PageID.217.) Plaintiff stayed seated in the car and continued to yell "white shirt." This was followed by more rounds of Defendants yelling "get out of the car," and "you are under arrest," and Plaintiff responding "white shirt" and "under arrest for what". (*Id*. at 2:35-3:00.) The officers continued their efforts to unlatch Plaintiff's seatbelt and remove

3

him from the car, and Plaintiff continued to be uncooperative. Plaintiff later acknowledged that he had his hands on the steering wheel and his left leg on the pavement bracing himself so he would not be pulled out of the car. (Johnson dep. at 48-49; ECF No. 16-6, PageID.300-301.) Finally, Defendants cut the seatbelt shoulder strap. (ECF No. 16-4, PageID.222; Body Cam video at 3:37.) Officer Dickie reached around Plaintiff's arms and sprayed him with a third burst of pepper spray. (No. 16-4, PageID.217; Body Cam video at 3:40.) Defendants both struggled with removing the seatbelt from around Plaintiff, while he remained uncooperative. More Warren police officers arrived on the scene. Four additional officers helped Defendants pull Plaintiff out of the car. (Ex. 2 Dash Cam video at 3:40-4:09.) Plaintiff and Officer Quaranta fell to the ground during the process of extracting Plaintiff from the car.

Defendants and several other officers held Plaintiff on the ground and instructed him to put his hands behind his back and to stop resisting. While restrained on the ground, Plaintiff stated three times he could not breathe due to the pepper spray and continued to complain about not getting a white shirt. (*Id*. 4:39-5:08.) Eventually, Defendants and additional officers rolled Plaintiff onto his stomach and applied two sets of double locked handcuffs behind his back. Plaintiff was searched and placed in the back of Defendants' patrol vehicle. He was transported to the Warren Police Department.

## II.     Standard For Summary Judgment

Federal Rule of Civil Procedure 56(a) provides, "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and

4

the movant is entitled to judgment as a matter of law." A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has an initial burden to inform the court of the portions of the record "which it believes demonstrate the absence of a genuine dispute of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the non-moving party must make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322-23. Finally, the court "consider[s] all facts and inferences drawn therefrom in the light most favorable to the nonmovant." *City of Wyandotte v. Consol. Rail. Corp.*, 262 F.3d 581, 585 (6th Cir. 2001).

**III.     Analysis**

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*.

To determine whether a government official is entitled to qualified immunity, the court must view the evidence in the light most favorable to the party asserting the injury and ask whether "the facts alleged show the officer's conduct violated a constitutional

5

right". *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Here, the events in question were captured by Officer Dickie's body cam and the police dash cam video. Therefore, the Court may "view [ ] the facts in the light depicted by the videotape[s]" with any gaps filled in by the record taken in the plaintiff's favor. *Scott v. Harris*, 550 U.S. 372, 381 (2007). If a violation can be made out, the next step is to ask whether the particular right was clearly established. *Saucier*, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 201-02. If the law is not sufficiently clear such that a reasonable public official would be on notice that his conduct is clearly unlawful, qualified immunity is appropriate. *Id*. at 202. The plaintiff bears the burden of establishing that a right is clearly established.

### A. Constitutional Violation

A police officer may use force "reasonably necessary" to effectuate a seizure. *Cox v. Treadway*, 75 F.3d 230, 235 (6th Cir. 1996). The Fourth Amendment is not violated where the force used is "objectively reasonable" under the circumstances presented. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The Court must make "allowances for the fact that officers are often forced to make split-second judgments - in circumstances that are tense, uncertain and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id*. at 397. Whether the officer's conduct was reasonable requires consideration of the totality of the circumstances, including, but not limited to: (1) "the severity of the crime at issue," (2) "whether the suspect pose[d]

6

an immediate threat to the safety of the officers or others," and (3) "whether he [wa]s actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.

Defendants concede that the improper left turn and illegally tinted windows, while serious infractions, are not so severe to permit an officer to use increased force absent other factors. Because Plaintiff was not suspected of a particularly serious crime involving violence, the first *Graham* factor weights in his favor.

When an interaction involves multiple uses of force, courts analyze excessive force claims in segments, because an officer must act reasonably at every stage. *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996). Here, Plaintiff identifies three separate instances of alleged excessive force: 1) the immediate opening of the car door; 2) the use of pepper spray; and 3) the forcible extraction of Plaintiff from the vehicle. (ECF No. 19, PageID.363.) The Court continues its analysis of the reasonableness of Defendants' conduct in relation to what was happening at each stage of their interaction with Plaintiff.

    1.     **Opening Vehicle Door**

        a.   **Threat to officers or others**

Plaintiff's vehicle had tinted windows, which Plaintiff refused commands to lower, such that Defendants could not clearly see what was happening inside the vehicle. This situation posed a threat to officer safety, which supports Officer Dickie's decision to open the car door. (ECF No. 16-4, PageID.193.) Because "roadside encounters between police and suspects are especially hazardous," officers may take measures to protect themselves. *Moore v. Oakland Cnty., Michigan*, 126 F.4th 1163, 1168 (6th Cir.

7

2025) (quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)); *see also, United States v. Matthews*, 422 F. Supp. 3d 1235, 1251 (W.D. Ky. 2019) (opening driver-side door was reasonable where police "could not see inside the vehicle because of the tint on the windows," and the driver "fail[ed] to comply with [officer's] directive to roll down the window"). Opening the door allowed Officer Dickie to see what Plaintiff was doing inside the vehicle and to further communicate with Plaintiff.

An additional danger existed here as Plaintiff pulled his vehicle over in the bike lane of a busy street during the evening rush hour. Road traffic posed a threat to the officers, and the ongoing interaction between Plaintiff and Defendants posed a threat to others who were using the street and bike lane.

After the car door was opened and the interaction continued, Plaintiff proceeded to disobey every command the officers gave him. The Court finds that allowing Plaintiff to remain in his vehicle, possibly within reach of a weapon or contraband, posed a continuing risk to the safety of the officers and others. This factor weighs in favor of Defendants employing reasonable force to open the vehicle door and take subsequent actions to remove Plaintiff from the vehicle.

### b. Active resistance

The Sixth Circuit holds that where a suspect actively resists arrest, police officers can use force to subdue him, but if the suspect does not resist or has ceased to resist, then force may not be used. *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015). Active resistance has been described as behavior that involves "physically struggling with, threatening, or disobeying officers." *Id*. at 641 (citing *Cockrell v. City of Cincinnati,*

8

468 Fed. Appx. 491, 495 (6th Cir.2012) (collecting cases)). However, noncompliance alone does not indicate active resistance. *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013).

The body cam video clearly shows that Plaintiff was verbally defiant and refused each of the officers' many commands. This began with Plaintiff refusing to roll down his window and continued with him trying to close the car door on Officer Dickie, not turning off the motor, ignoring repeated requests for his license, and bracing himself inside the car when he was instructed to exit the vehicle.

In addition, Plaintiff physically struggled with the Officers by bracing himself in the car and pulling away to avoid their attempts at unfastening his seatbelt and removing him from the car. Plaintiff expressly told the officers he would not exit his car, later confirming this was his intention during his deposition. By conceding that he was not going to leave his vehicle, Plaintiff concedes that he resisted arrest. The video backs this up. Plaintiff's intent not to cooperate is also clear from his repeated calls for a white shirt. His focus during the entire interaction was for the Defendants to stop what they were doing and get him a supervisor. The Court finds that Plaintiff's behavior and actions qualify as active resistance.

An officer may order an actively resistant motorist to exit his vehicle. *Moore*, 126 F.4th at 1168 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977)). Here, the force used by Defendants to remove Plaintiff from his vehicle included the use of muscling techniques, holding his arm and reaching around his body to remove the seatbelt. Defendant's force was directed at trying to get Plaintiff to comply with

9

commands so they could remove him from the car. Viewing the facts as they appear in the videos, and otherwise in the light most favorable to Plaintiff, Defendants' use of force was responsive to, and reasonable given the nature of, Plaintiff's active resistance.

Considering all the circumstances facing the officers, the Court finds there was no Fourth Amendment violation in the force employed by Defendants in opening the vehicle door nor in their subsequent actions to remove Plaintiff from the vehicle.

### 2. Use of Pepper Spray

#### a. Threat to officers or others

The Sixth Circuit has observed that "the use of pepper spray may constitute excessive force once an individual is secured and poses no threat to the officers or others in the area." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 897 (6th Cir. 2004). Here, the Court has found that the officers reasonably believed Plaintiff posed a threat to their safety while he remained in his vehicle. Officer Dickie described using a short burst of pepper spray three times to distract Plaintiff so he would stop resisting Defendants' attempts to remove him from his car after they told him he was under arrest. Officer Dickie believed the first two sprays did not hit Plaintiff's eyes because they had no impact on his resistance. The video corroborates this assessment. Both before and after the pepper spray was used, Plaintiff continued to actively resist the officers' commands, preventing them from removing his seatbelt. No pepper spray was used after Plaintiff was outside his vehicle.

Plaintiff's threat to officer safety weighs in favor of the reasonableness of Defendants' use of pepper spray to distract Plaintiff from resisting the officers' attempts to remove him from the vehicle.

### b. Active resistance

Generally, when a suspect actively resists arrest or detainment or is non-compliant, a police officer does not violate the Fourth Amendment by employing reasonable force, which can include the use of pepper spray or even a taser. *See Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 97 (6th Cir. 2012); *Rudlaff*, 791 F.3d at 642 (officers can use force to ensure compliance and subdue suspect who is actively resisting arrest).

Given that Plaintiff was actively resisting and was struggling as Defendants attempted to remove him from the vehicle, Officer Dickie's limited use of pepper spray was objectively reasonable and did not constitute excessive force in violation of the Fourth Amendment.

### 3. Forceable Extraction from Vehicle

Defendants forcibly removed Plaintiff from the vehicle and took him to the ground, where he was restrained and handcuffed. These two events are connected in this case because the apparent force it took Defendants to remove Plaintiff from the vehicle caused Plaintiff, as well as Officer Quaranta, to tumble to the pavement.

11

### a. Threat to officers or others

As discussed in the previous sections, Plaintiff posed an immediate threat to the safety of officers and others while he remained in his vehicle. This factor weighs in favor of the reasonableness of Defendants forcibly extracting Plaintiff from the vehicle.

### b. Active resistance

The Sixth Circuit has held that takedown maneuvers are excessive when the suspect is "generally compliant", subdued and not resisting. *LaPlante v. City of Battle Creek, Michigan*, 30 F.4th 572, 583 (6th Cir. 2022). In a case from this district, the court found there was an issue of fact whether a plaintiff was actively resisting at the time he was taken down where he had been passive and offered to peacefully exit the vehicle, but the defendant officer said plaintiff was "going to do it our way." *Bell v. Korkis*, No. 2:19-CV-13565, 2024 WL 69807, at *8 (E.D. Mich. Jan. 5, 2024). On the other hand, a person who refuses to cooperate with the arrest and handcuff process is resisting arrest such that holding him down, and even employing knee strikes and tasering may be justified. *Rudlaff*, 791 F.3d at 642.

Here, Plaintiff resisted all officer commands and braced himself in the car to avoid being removed, leaving officers with no choice but to forcibly remove him from the car. While Plaintiff did not swing at officers, he held himself in place with his legs and his free arm to avoid being extracted from the car. Even after Plaintiff's seatbelt was removed, four officers struggled to pull him out of the car. Plaintiff's active resistance made his extraction and takedown a reasonable use of force under the circumstances.

For the reasons expressed, the Court finds Defendants' use of force was reasonable and did not violate Plaintiff's Fourth Amendment rights.

## B. Clearly Established Right

If the Court is wrong about there being no Fourth Amendment violation because Plaintiff's resistance was not sufficient to justify having his door opened, being pepper sprayed, or being forcibly removed from his vehicle and taken to the ground, Plaintiff must still identify caselaw that clearly establishes the law "beyond debate." This is because the plaintiff bears the burden of demonstrating that the defendants are not entitled to qualified immunity. *See Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009). To meet the burden, the plaintiff must identify a case that has facts that are similar enough to govern the present situation. *Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022) (citations omitted). Here, Plaintiff has failed to identify a single case, let alone one with similar facts, to demonstrate the law is clearly established that: (1) Officer Dickie could not open the car door when Plaintiff refused to roll down his window in a car with tinted windows; (2) Officer Dickie could not use pepper spray when Plaintiff actively resisted Defendants' attempts to take off his seat belt so he could be removed from the vehicle; and (3) Defendants could not forcibly extract Plaintiff from his vehicle for actively resisting all of their commands, including that he should exit the vehicle after the officers arrested him.

Plaintiff makes only one argument, that Defendants violated clearly established law by failing to communicate a lawful order or reason for the traffic stop before proceeding with physical coercion. However, the case cited by Plaintiff does not stand

13

for this proposition. Rather, the case holds that it is not clearly established that the Fourth Amendment is violated where the officer had to decide "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004). This Court is not aware of any law stating that an officer may not use force until he has communicated a lawful order or reason for a traffic stop.

Qualified immunity is an "'exacting standard' that gives officers lots of leeway, requiring their conduct to violate clearly established law to defeat the defense." *Rudlaff*, 791 F.3d at 643 (citing *City & Cnty. of San Francisco v. Sheehan,* 575 U.S. 600, 611 (2015)). The burden is on Plaintiff to overcome the qualified immunity defense, and he has failed to do so in this case.

### C. Other Evidence Relied on by Plaintiff

Plaintiff offers other evidence that has no relevance to the issues before the Court. This includes the fact that the state court granted his motion to suppress and dismissed the criminal complaint brought against him. So too, the prior misconduct by Officer Quaranta that was explored in his deposition is not germane to the qualified immunity analysis. Plaintiff also points to a comment Officer Quaranta made before he searched the vehicle, that there better be a gun in the car. Quaranta explained that in his experience, a person would not resist and refuse to comply the way Plaintiff did during a traffic stop unless there was something more to it. (ECF No. 19-5, PageID.408.) This comment, made after Plaintiff had been restrained in handcuffs, is not relevant to the qualified immunity analysis. Next, Plaintiff identifies himself as being

14

African American, but he does not expound on a racial aspect to his interactions with Defendants. Finally, although Plaintiff had the right to call for a supervisor during the traffic stop, the Court is not aware of any law that requires the police to provide one.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: September 15, 2025

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 15, 2025, by electronic and/or ordinary mail.

s/Marlena Williams
Case Manager

15